# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

RONALD D. LINES #473397                              CIVIL ACTION

versus                                              NO. 07-3532

TERRY TERRELL, WARDEN                               SECTION: "R" (1)

## REPORT AND RECOMMENDATION

Petitioner, Ronald D. Lines, is a state prisoner incarcerated at the Allen Correctional Center, Kinder, Louisiana. He has filed a document entitled "In Re: Request to have Habeas Corpus addressed by this Honorable Court (which was held in abeyance)."[1] The United States District Judge construed that document as a motion to reopen, and she referred the matter to the undersigned United States Magistrate Judge.[2] For the following reasons, **IT IS RECOMMENDED** that the motion to reopen be **GRANTED** and that the underlying *habeas corpus* petition be **DISMISSED WITH PREJUDICE**.

---

[1] Rec. Doc. 18.

[2] Rec. Doc. 19.

On August 30, 2003, petitioner was convicted of possession of 400 grams or more of cocaine in violation of Louisiana law.[3] On October 31, 2003, he was sentenced to a term of thirty years imprisonment and fined $250,000.[4] On March 24, 2005, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[5] He then filed with the Louisiana Supreme Court a related writ application which was denied on January 13, 2006.[6]

On or about December 19, 2006, petitioner filed with the state district court an application for post-conviction relief.[7] That application was denied on May 29, 2007.[8] He did not seek review of that denial by Louisiana First Circuit Court of Appeal or the Louisiana Supreme Court.

On or about June 26, 2007, petitioner then filed this federal application for *habeas corpus* relief.[9] In support of his application, he asserted the following claims:

     1.     Petitioner received ineffective assistance of counsel;

---

  [3] State Rec., Vol. VIII of X, transcript of August 29, 2003, p. 125; State Rec., Vol. I of X, minute entry dated August 29, 2003; State Rec., Vol. I of X, jury verdict form.

  [4] State Rec., Vol. VIII of X, transcript of October 31, 2003, p. 13; State Rec., Vol. I of X, minute entry dated October 31, 2003.

  [5] State v. Lines, No. 2004 KA 1074 (La. App. 1st Cir. Mar. 24, 2005) (unpublished); State Rec., Vol. X of X.

  [6] State v. Lines, 920 So.2d 234 (La. 2006) (No. 2005-KO-1448); State Rec., Vol. X of X.

  [7] State Rec., Vol. X of X.

  [8] State Rec., Vol. X of X, Order dated May 29, 2007.

  [9] Rec. Doc. 1. The application is undated but it was mailed in an envelope metered on June 26, 2007.

2.      The prosecution engaged in misconduct;

3.      The trial judge was biased and abused his authority;

4.      There was insufficient evidence to support petitioner's conviction; and

5.      Petitioner's sentence is excessive.

The state did not challenge the timeliness of the federal application but argued that it must be dismissed because petitioner had not yet exhausted his state court remedies.[10] The undersigned agreed and recommended that the petition be dismissed without prejudice on that basis.[11] Petitioner objected to that recommendation and moved that his federal petition instead be stayed until such time as he exhausted his state court remedies.[12] The United States District Judge granted that motion, stayed and administratively closed the proceedings, and ordered petitioner to file a motion to reopen the proceedings within thirty days after completion of the state court proceedings.[13] On December 18, 2008, the Louisiana Supreme Court denied petitioner relief, thereby completing petitioner's state court review.[14] Petitioner thereafter filed the instant timely motion to reopen.

---

[10] Rec. Docs. 7 and 8.

[11] Rec. Doc. 14.

[12] Rec. Doc. 15.

[13] Rec. Doc. 17.

[14] State _ex rel._ Lines v. State, 996 So.2d 1127 (La. 2008) (No. 2008-KH-0645); Supplemental State Rec., Vol. I of I.

In that petitioner has complied with the District Judge's order regarding the conditions for reopening, the motion to reopen should be granted and, for the following reasons, petitioner's underlying *habeas corpus* claims should be denied.[15]

<u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly

---

[15] In its supplemental response filed in connection with the motion to reopen, the state contests neither the timeliness of petitioner's federal application nor the exhaustion of his state court remedies. Rec. Doc. 29, pp. 3-4.

identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

On October 14, 2001, James W. Holden, Jr., owner of Holden's Wrecker Service, telephoned the Louisiana State Police to report that a man had called him and said that he was willing to pay $1,000.00 cash to have a car towed from the Albertson's supermarket in Covington, Louisiana to Florida. Holden thought the call was strange and wanted the police to look at the car.[FN 1]

[FN 1] A test drive of the vehicle following the arrest of the defendant failed to reveal any type of mechanical failure. Drug Enforcement Administration Special Agent Mark Nicholson indicated he was aware of the use of a tow truck to tow a vehicle with contraband to avoid the vehicle being stopped, investigated, and searched while being operated on the roadway.

On October 14, 2001, at approximately 11:50 a.m., Louisiana State Trooper Louis Calato arrived at the Covington Albertson's parking lot. He saw a Ford Explorer with a raised hood. Clive

Peyrefitte was looking into the engine of the vehicle and Marlon Seawell was partially in the passenger side of the vehicle with the passenger-side door open. Trooper Calato asked Peyrefitte if he needed assistance. Peyrefitte replied he did not, closed the hood of the Explorer, and stated that he had already called Holden's Wrecker Service. Trooper Calato detected a strong odor of marijuana on Peyrefitte and noticed that he also became more nervous the longer Trooper Calato was at the scene. Peyrefitte kept looking around, shuffling around, and playing with his cellular telephone. Trooper Calato felt that "[s]omething just didn't feel right with [Peyrefitte]."

Trooper Calato asked Peyrefitte for his driver's license, and Peyrefitte produced a valid Florida driver's license. In response to questions from Trooper Calato, Peyrefitte indicated the Explorer was his vehicle. Peyrefitte initially ignored a question concerning where he was coming from. Seawell exited the Explorer and stood between the passenger-side door and the right-front fender of the vehicle. For officer safety, Trooper Calato asked Peyrefitt to walk to the rear of the Explorer. Thereafter, Peyrefitte stated he was coming from Houston. In response to the question, where in Houston was he coming from, Peyrefitte stated he was coming from Brownsville, which Trooper Calato recognized as "a very big drug corridor." When Trooper Calato stated he did not realize Brownsville was in Houston, Peyrefitte became extremely nervous. Peyrefitte claimed he had misunderstood the question, and he was coming from Houston. Peyrefitte shuffled his feet and stopped making eye contact with Trooper Calato. Peyrefitte indicated he had been in Houston for two days and had stayed with his friend, "Oscar."

Trooper Calato then walked over to Seawell. As Trooper Calato walked alongside the Explorer, he detected a faint odor of marijuana coming from the interior of the vehicle through the driver's door, which was "partially down[.]" Trooper Calato asked Seawell for identification, and Seawell produced a Florida resident card. Seawell also indicated he and Peyrefitte had been coming from Houston, but stated they had stayed there for three or four days. Trooper Calato asked Seawell how he could not know how long he and Peyrefitte stayed in Houston if they just came from there. Seawell became agitated, shuffled his feet, and did not look at Trooper Calato when he answered. He stated, "I told you, three or four days." In response to further questioning, Seawell indicated he and Peyrefitte had stayed with Peyrefitte's "peeps [slang for friends or people]" in Houston. Trooper Calato questioned why, if Seawell stayed with someone three or four days, he would not know their

names. Seawell stated, "I told you once, I stayed with his peeps in Houston."

Trooper Calato asked Peyrefitte for consent to search the Explorer, and Peyrefitte gave verbal consent. Trooper Calato was going to his police unit to get a vehicle consent to search form and heard Seawell tell Peyrefitte, "You can't let him search the vehicle. It's not yours." Trooper Calato returned to the Explorer and stated to Peyrefitte, "You told me this was your vehicle." Peyrefitte replied that the Explorer was not his vehicle, but had been lent to him by a friend. Trooper Calato checked on the registration of the license plate of the Explorer and learned the vehicle was registered to Willie Morris in Lakeland, Florida. Trooper Calato asked Peyrefitte if he was in possession of the vehicle, and he answered affirmatively. Trooper Calato asked Peyrefitte if he was the driver of the vehicle, and he answered affirmatively. Trooper Calato advised Peyrefitte that he could give consent to search the vehicle. Seawell told Peyrefitte that he could not let Trooper Calato search the vehicle because it did not belong to Peyrefitte. Thereafter, Peyrefitte refused to give consent to search the vehicle.

The Louisiana State Police did not have a narcotics dog available, so Trooper Calato requested that his Troop call the Sheriff's office and see if one of their narcotics dogs was available to come out to the scene. At approximately 12:30 p.m., Deputy Bobby Marx arrived at the scene with a narcotics detection dog. The dog began searching at the front fender of the driver's side of the vehicle and alerted to the rear of the Explorer.

After obtaining a search warrant, Trooper Calato returned to the scene. A search of the rear of the Explorer revealed the presence of a suitcase containing eighteen packages of suspected cocaine.[FN 2] The substance was later determined to have a net weight of 14.16 kilograms or approximately 29 pounds and to be 83 percent pure cocaine. The potential street value of the cocaine was over $1,000,000. Rather than being packaged in two-pound blocks for bulk sale, the cocaine was packaged in heat-sealed bags suitable for being attached onto a body with duct tape, Ace bandages, elastic, or Spandex.

[FN 2] Two assault rifles and two pistols were also recovered from the Explorer.

Peyrefitte and Seawell were arrested and advised of their rights. Seawell indicated he had not been traveling in the Explorer,

but had followed the Explorer from Texas in a Dodge Stratus. Keys to a Dodge Stratus (later determined to have been rented by Edward Shaw) were recovered from Seawell's pocket. The Dodge Stratus was parked behind the Explorer in an adjacent parking spot. An inventory of the trunk of the Dodge Stratus revealed the presence of a hat; a suitcase containing items connecting it to Shaw, including Spandex pants apparently with adhesive on them, and a Wal-Mart receipt for a suitcase like the one containing the cocaine; clothes; a knife; duct tape; and superglue. A white envelope with "Covington LA 10 Super 8 Motel 121 985-892-4470 121" written on it was recovered from a pocket on the driver's side door of the Explorer.

The Super 8 Motel was approximately .25 miles away from the Albertson's parking lot. Several police officers went to room 121 of the motel and knocked on the door, which was answered by Edward Shaw. After explaining that they were conducting a narcotics investigation, Shaw invited the police into the room. The defendant, Ronald Lines, was in the room and consented to a search. When asked about the whereabouts of the Dodge Stratus he had rented, Shaw stated he loaned the vehicle to Line's [sic] friend. When asked who had the Dodge Stratus, the defendant stated a friend of his from Belize had the vehicle.

A suitcase that the defendant stated he owned was found in the room. A search of the suitcase uncovered seven Ace bandages and spandex pants. Trace levels of cocaine were subsequently detected on the bandages, but testing was unable to confirm the presence of cocaine on the spandex pants. The defendant claimed the bandages were for his varicose veins. One of the defendant's bags also contained a white sock that apparently had on it adhesive or glue residue.

Seawell was brought over to the motel, and Shaw identified him as the person to whom he had loaned the Stratus. The defendant identified Seawell as his friend from Belize to whom he had lent "his" vehicle. Shaw and the defendant were arrested. Shaw subsequently pled guilty.

Shaw testified at trial that he met the defendant in Belize in 1991, and they had been friends. In July 2001, Shaw traveled with the defendant from Bemopan, Belize, to Chetumal, Mexico, to Tampa, Florida. While at a motel in Chetumal, Shaw and the defendant came into possession of approximately four or five packages of a substance that Shaw was told was cocaine. Shaw placed two of the packages into his socks. When asked if the defendant took the other packages, Shaw stated that he did not wish

to speculate as to what the defendant may have done, but indicated he did not notice any packages when he left the motel. He claimed he did not know who paid for the air and bus tickets, but indicated he did not pay for the tickets and he was traveling only with the defendant. Shaw and the defendant were met at the airport in Tampa and then went to Lakeland, Florida. Shaw removed the packages of cocaine from his socks and left them on a bed in the motel room he was sharing with he defendant in Lakeland. He indicated someone came for the cocaine while he was not present. He also indicated the defendant gave him some money before he (Shaw) continued on to Canada. When asked if the money defendant gave him in Lakeland was payment for helping him to smuggle cocaine into the United States, Shaw stated, "[s]ome people might consider that."

Shaw also testified in regard to the instant offense. He said that he and Lines began with a trip from Belize to a motel in Chetumal. Shaw tried, but was unsuccessful in locating people to buy the cocaine in Mexico. They then traveled to Brownsville, Texas where he and the defendant shared a hotel room. Packages of cocaine that Shaw had removed from his person in Matamoros, Mexico were present in the hotel room. Shaw and the defendant discussed how they were going to travel to Florida with the cocaine. Due to the increase in security in the United States following the September 11 attacks, Shaw and the defendant ruled out traveling by plane or public vehicle. The defendant testified that he did not carry a credit card, so in Brownsville, Shaw rented a Dodge Stratus for the journey to Florida. Shaw did not buy an extra suitcase in Texas. Shaw and the defendant traveled in the Stratus. When asked where the cocaine was located, Shaw stated it was not in his luggage, but he expected it was packed. In response to the question of whether the defendant had control of and made decisions concerning the cocaine, Shaw stated, "I thought so."

When Shaw became tired of driving, he and the defendant rented a room at the Super 8 Motel in Covington. Seawell came to visit the defendant at the motel and asked to borrow the rental car. Shaw gave Seawell the keys after the defendant assured Shaw it would be okay to do so. Seawell took the bag containing the cocaine with him when he left.

The defendant also testified at trial. He denied smuggling cocaine into the United States or having knowledge that Shaw had cocaine with him when he entered the United States in October 2001. He denied having knowledge of Shaw ever bringing cocaine into the United States. He denied any knowledge of the contents of the

suitcase containing the cocaine. He claimed he carried the Ace bandages as a preventative and curative measure for Leishmaniasis – a microorganism found in jungles.[16]

Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective. Petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Id. at 697.

To prevail on the deficiency prong of the Strickland test, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993)

---

[16] State v. Lines, No. 2004 KA 1074, at pp. 2-8 (La. App. 1st Cir. Mar. 24, 2005) (unpublished); State Rec., Vol. X of X.

(quoting Strickland, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to a state court decision denying such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). For the following reasons, the Court finds that neither of those conditions is met in the instant case and that, therefore, this federal court should defer to the state courts' rulings rejecting these claims.

First, the Court notes that petitioner indicates that he was represented at one point by David Dickson, an attorney who was subsequently disbarred. However, to the extent that petitioner is claiming that Dickson performed ineffectively, that claim clearly has no merit. Even if Dickson performed deficiently during the period when he was enrolled in the case, petitioner cannot show the prejudice necessary to support a Sixth Amendment claim. Petitioner fired Dickson and hired Martin Regan, who enrolled as counsel of record in November of 2002,[17] over nine months prior to trial. Therefore, the result in this proceeding can in no way be attributed to Dickson' performance. Accordingly, this Court need only consider the following claims regarding Regan's representation.

Petitioner first makes a vague claim concerning Regan's handling of discovery. Regardless of how that claim is interpreted, it fails for the following reasons.

To the extent that he is claiming that Regan performed inadequate discovery, petitioner has not met his burden of proof. It is true that a "trial counsel's failure to review the prosecution's file prior to trial can, in certain circumstances, constitute performance that falls below the level of reasonable performance." Day v. Quarterman, 566 F.3d 527, 540 (5th Cir. 2009). However, petitioner has presented no evidence whatsoever in support of his bald allegation that counsel's performance was deficient in this respect. In the instant case, the state provided "open file" discovery, making all of its evidence and files available to the defense for inspection.[18] Petitioner has not demonstrated that counsel failed to take advantage of that opportunity. Moreover, even if counsel failed to adequately examine the state's evidence and files, petitioner has not met

_____

[17] State Rec., Vol. I of X, Motion to Enroll and Order.

[18] State Rec., Vol. I of X, State's Answer to Motions for Discovery.

his burden to show what counsel would have discovered by further review which he had not already discovered during his other preparations for trial, nor to demonstrate a reasonable probability that discovery of any such information would have altered the outcome at trial. Accordingly, this claim must be rejected. Day, 566 F.3d at 540-41.

It appears that petitioner may also be claiming that unspecified defense exhibits were excluded at trial because Regan failed to adequately respond to the state's requests for discovery. However, petitioner does not further explain this allegation or identify any exhibits which were actually offered but excluded at trial on this basis. Accordingly, petitioner's claim in this respect is purely conclusory and, therefore, cannot serve as a basis for relief. See, e.g., Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000) ("This Court has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding.").

Petitioner next claims that counsel was not adequately prepared to challenge Shaw's testimony at the Prieur hearing regarding the prior incident of drug smuggling. The Louisiana Code of Evidence provides:

> Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

La. Code Evid. art. 404(B)(1).  In State v. Prieur, 277 So.2d 198 (La. 1973), the Louisiana Supreme

Court outlined the procedure to be used when the state intends to offer such evidence.  Under Prieur,

the state is required to give a defendant notice of its intent to use the evidence and of which

exception to the general rule excluding such evidence permits its use in that case.  In addition, the

state must prove by clear and convincing evidence at a pretrial hearing that the defendant committed

the other crimes.

On July 21, 2003, the state filed a notice stating:

> The State intends introduce evidence that, during the months of June, July and August of 2001, defendant Lines and defendant Shaw transported cocaine from Belize to the United States.  The cocaine was delivered to defendant Seawell in Lakeland, Florida.  Defendant Shaw later transported the cash proceeds from this sale back to defendant lines in Belize.
> The State will also introduce evidence that defendant Lines and defendant Shaw transported the cocaine involved in this criminal proceeding into the U.S. by smuggling said cocaine across the U.S. - Mexico border.
> The evidence of other crimes is admissible at trial under the provisions of Louisiana Code of Evidence article 404(B)(1), which provides that evidence of other crimes is admissible to show "intent, preparation, plan, knowledge, identity, absence of mistake or accident."  In accord with the provisions of that article, the State hereby provides timely notice in advance of trial.[19]

A Prieur hearing was then held in the case on August 18, 2003.[20]  At that hearing, the

attorney for co-defendant Seawall objected that the state had not responded to discovery requests

regarding the Prieur notice.  The prosecutor argued that no response was required:

---

[19]  State Rec., Vol. I of X, State's Notice of Intent to Introduce Evidence of Other Crimes.

[20]  State Rec., Vol. II of X, transcript of August 18, 2003.

Your Honor, discovery requests would deal with the case in-chief. And the State has turned over everything to the defense in the case in-chief. Prieur notice is exactly what it is, notice of our intent to introduce other crimes; and they're entitled to a hearing ahead of time, which is happening today.

There is no requirement that we also give them pre-hearing discovery for [P]rieur. However, we have discussed this with Counsel various times, and the witnesses listed in the [P]rieur notice are the only witnesses. The information listed in the [P]rieur notice is the information to the best of the State's knowledge. We have no tangible evidence corroborating this at this point in time, nor is none known to us. So everything that they're requesting is contained in the [P]rieur notice.[21]

On direct appeal, the Louisiana First Circuit Court of Appeal found that the state had complied with article 404(B).[22]

As noted, petitioner now claims that his counsel was not adequately prepared for the Prieur hearing. However, petitioner does not indicate what additional action he believes counsel should have taken in advance of the hearing to be better prepared. Moreover, the Court notes that defense counsel performed admirably at that hearing, grilling Shaw on cross-examination at great length.[23] Having reviewed petitioner's allegations and the record, the Court finds that petitioner simply has not met his burden to demonstrate either that counsel's preparation for the Prieur hearing was deficient or that any prejudice whatsoever resulted. Accordingly, this claim fails.

Petitioner next argues that counsel learned at the Prieur hearing that documents seized from Shaw were returned to him. Petitioner claims that his counsel should have then "inquire[d] as

---

[21] State Rec., Vol. II of X, transcript of August 18, 2003, p. 7.

[22] State v. Lines, No. 2004 KA 1074, at p. 18; State Rec., Vol. X of X.

[23] State Rec., Vol. II of X, transcript of August 18, 2003, pp. 30-65.

to what material was removed and its relevancy to the defense,"[24] because the documents were critical to proving petitioner's innocence.

In support of this claim, petitioner attached to his petition the transcript of a hearing held in Shaw's case on August 2, 2002.[25] That transcript reflects that Shaw requested that the state release to him his personal belongings not being used as evidence in the case. With respect to documents included in those belongings, the parties agreed that copies would be made of any documents Shaw wanted returned.

At the Prieur hearing in petitioner's case, Shaw testified that "a considerable amount" of paperwork was in fact returned to him.[26] However, the prosecutor stated that "[a]ny documents seized from [Shaw] at the time of his arrest have been copied and turned over to Counsel. All documents."[27] Petitioner's counsel did not dispute that assertion,[28] and petitioner has presented no evidence whatsoever to refute the assertion.

In light of the foregoing, there is no reason to believe that the copies of the documents were not in fact given to defense counsel. Further, if such copies were provided, there was no need for defense counsel to make further inquiry regarding the documents at the Prieur hearing; rather,

---

[24] Rec. Doc. 1, supporting memorandum, p. 12.

[25] Rec. Doc. 1, supporting memorandum, Exhibit H.

[26] State Rec., Vol. II of X, transcript of August 18, 2003, p. 52.

[27] State Rec., Vol. II of X, transcript of August 18, 2003, p. 50; see also State Rec., Vol. II of X, transcript of August 18, 2003, p. 96.

[28] See State Rec., Vol. II of X, transcript of August 18, 2003, p. 50.

he could simply review the documents in his file and determine their relevance. Accordingly, defense counsel did not perform deficiently by failing to further pursue this matter at the <u>Prieur</u> hearing, and petitioner certainly has not demonstrated that he suffered any prejudice in this regard.

Petitioner next claims that counsel instructed petitioner "to lie to the court." Petitioner's statement of this claim is as follows:

> Instructed Petitioner to lie to the court, when Petitioner objected to this tactic, his attorney of record Mr. Regan stated they do and pointed to the prosecutor's table. Petitioner had nothing to lie about, he had not brought any drugs into this country, nor had he financed the bringing of any drugs into this country. The lies were committed by the prosecution when they allowed the testimony of the only person who could have been guilty of this crime and they had bought his lies and made him a major part of the prosecution's case against Mr. Lines, One Edward Shaw.[29]

Petitioner does not identify the substance of the proposed lie, much less submit any evidence whatsoever is support of this serious allegation. Nevertheless, even if the Court assumes *arguendo* that the allegation is true, petitioner rejected the advice and refused to lie. Having rejected counsel's purported advice, petitioner clearly was not prejudiced by the advice. Accordingly, this claim necessarily fails.

Petitioner also claims that counsel was ineffective for interrupting petitioner's testimony at trial and interjecting a lie by asking questions falsely suggesting that marks on the Spandex pants might be a handprint.[30] Although the point of this claim is not entirely clear, it need

---

[29] Rec. Doc. 1, supporting memorandum, p. 12.

[30] <u>See</u> State Rec., Vol. VIII of X, transcript of August 29, 2003, pp. 216-20.

not be further explored because, in any event, petitioner does not demonstrate how he was prejudiced by this line of questioning with its implicit suggestion. Accordingly, the claim fails.

Petitioner next claims that counsel was ineffective for essentially inviting the jury to find petitioner guilty. In his closing argument, defense counsel told the jurors that "if you could figure out how to pack cocaine into this [clothing] with tape here, at this point, it'd be meaningful, then you should convict my client."[31] Unfortunately, in her rebuttal argument, the prosecutor proceeded to offer a theory as to how that feat might have been accomplished.[32] It is fair to surmise that defense counsel probably regretted his remark, and one could argue that it is *never* wise for defense counsel to issue such a challenge. That said, it is nevertheless much too great a leap to suggest that, in light of the evidence presented in this case, there is a reasonable probability that the result of the proceeding would have been different if only counsel had not issued that flippant challenge. Therefore, petitioner cannot demonstrate that he was prejudiced by the remark, and his claim fails.

Petitioner next claims that counsel was ineffective for failing to file an appeal and for failing to object to the sentence as excessive. For the following reasons, those claims have no merit.

The former contention fails as a matter of fact. Counsel filed a timely motion for appeal on November 5, 2003.[33]

---

[31] State Rec., Vol. VIII of X, transcript of August 29, 2003, p. 32.

[32] State Rec., Vol. VIII of X, transcript of August 29, 2003, p. 69.

[33] State Rec., Vol. I of X, Motion for Appeal.

The latter contention is a bit more problematic. Due to counsel's failure to appropriately challenge petitioner's sentence, the Louisiana First Circuit Court of Appeal refused to consider on direct appeal petitioner's claim that his sentence was excessive. The Court of Appeal held:

> [T]he defendant contends his sentence is unduly excessive. Louisiana Code of Criminal Procedure article 881.1, in pertinent part, provides:
>
>> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>>
>> . . .
>>
>> B. The motion shall be oral at the time of sentence or shall be in writing thereafter and shall set forth the specific grounds on which the motion is based.
>>
>> . . .
>>
>> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.
>
> Following the imposition of sentence herein, defense counsel stated, "[f]irst, we would note our objection to the sentence . ... We would advise the Court that the defendant intends to appeal not only his conviction but the sentence itself." Thereafter, the defendant failed to file a motion to reconsider sentence.
>
> The defendant failed to comply with the time requirements of Article 881.1 A(1). His oral objection at sentencing failed to urge a claim of excessiveness or any other specific ground for reconsideration of sentence. Accordingly, review of the instant assignment of error is procedurally barred. See La. Code Crim. P.

art. 881.1 E; **State v. Welch**, 98-0638, p. 12 (La. App. 1st Cir. 4/1/99), 744 So.2d 64, 71, rev'd on other grounds, 99-1283 (La. 4/11/00), 760 So.2d 317; **State v. Jones**, 97-2521 p. 2 (La. App. 1st Cir. 9/25/98), 720 So.2d 52, 52-53; **State v. Duncan**, 94-1563, p. 2 (La. App. 1st Cir. 12/15/95), 667 So.2d 1141, 1143 (en banc per curiam).[34]

Nevertheless, even if the Court were to assume that counsel performed deficiently in not filing a motion to reconsider sentence, petitioner's ineffective assistance claim still fails because he cannot show that he was prejudiced as a result. Petitioner's sentence and fine did not exceed the statutory maximums for his crime. See La.Rev.Stat.Ann. § 40:967(F)(1)(c). Further, at sentencing, the trial judge clearly set forth his reasons for the punishment imposed:

> The Court after listening intently during the week-long trial of the State of Louisiana versus Ronald Douglas Lines, the Court was struck by several things during the course of that trial that are very appropriate in considering the sentencing guidelines as set forth in 894.1 of the Code of Criminal Procedure.
>
> I did take note of the fact that Mr. Lines trained in the field of architecture and is at 59 years of age and he did not have a prior criminal history. However, I also took note of the fact that 37 pounds of cocaine, 83 percent pure, was being transported into the United States from out of this country.
>
> In order to not further the problem of drug usage and the attendant ruin that occurs to our society and our families and our loved ones as a result of that usage, the Court takes note of the fact that both during the course of the trial and even through the presentence investigation, Mr. Lines continues to disclaim any responsibility or any involvement in this activity. The Court finds this both unbelievable and also reprehensible from the standpoint that, until such time as an individual accepts responsibility for his or her actions, there is very little chance of rehabilitation in that individual.
>
> For those reasons and for the reasons that with over a million dollars worth of cocaine being smuggled into the country, Mr. Lines

---

[34] State v. Lines, No. 2004 KA 1074, at pp. 21-22; State Rec., Vol. X of X.

was obviously not in this for recreational purposes but as a cold-blooded business pursuit. The Court finds that there is an undue risk that during the period of a suspended sentence or probation, which of course is not available in this case, the defendant would commit other crimes.

I find that he is in need of correctional treatment or a custodial environment. And that any sentence less than that which the Court intends to impose would deprecate the seriousness of the offense.

It is very clear to the Court that this was a well-thought out, well-engineered scheme to smuggle cocaine into this country. It was a very lucrative scheme. And one which carries some very heavy consequences.[35]

After defense counsel objected to the sentence imposed, the trial judge stated: "[F]or the record, the Court has reviewed the case law indicating that only in the most serious of cases is it appropriate to impose the maximum sentence. And I can hardly imagine anything more serious than 37 pounds of 83 percent pure cocaine."[36]

In light of the foregoing, there is no reasonable probability that, had counsel filed a proper motion to reconsider sentence, the motion would have been granted or the sentence would have been found excessive on appeal.[37] Accordingly, petitioner cannot show that he was prejudiced by the failure to file such a motion.

---

[35] State Rec., Vol. VIII of X, transcript of October 31, 2003, pp. 10-12.

[36] State Rec., Vol. VIII of X, transcript of October 31, 2003, pp. 13-14.

[37] Under Louisiana law, the trial court's sentencing considerations are an important aid to an appellate court's review, and "much deference is given to its considerations and to the sentence it imposes." State v. San Miguel, 470 So.2d 444, 447 (La. App. 3rd Cir. 1985). Accordingly, a state appellate court will not "set aside a sentence as excessive absent a manifest abuse of the trial court's sentencing discretion." Id.; see also State v. Thompson, 842 So.2d 330, 338 (La. 2003) ("The trial judge is given a wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion."). Moreover, as explained in greater detail in this opinion, petitioner's sentence clearly is not excessive under federal law.

Petitioner next claims that his counsel was unprepared for trial, failed to adequately investigate the case, and failed to request needed discovery. Petitioner's allegation that counsel was unprepared for trial is conclusory and clearly insufficient to support a grant of relief. On the day of trial, defense counsel stated that he was ready for trial,[38] and his performance during the trial supports that statement. Petitioner's allegation concerning the allegedly inadequate investigation is similarly unconvincing. The gist of this allegation is that counsel should have secured additional evidence to show that petitioner's money came from selling real estate, not drug smuggling. However, even if such evidence was available, it was not exculpatory, in that engaging in the former activity in no way limits one's ability to also engage in the latter. From the evidence at trial, it is clear that at least some of petitioner's money came from the latter activity. In light of that evidence, there is no reasonable probability that the result of the proceeding would have been different if only additional evidence of petitioner's real estate transactions had been secured and introduced at trial. Lastly, petitioner's allegations regarding discovery were fully addressed previously in this opinion, and that issue does not warrant further discussion.

Petitioner also claims that his counsel was ineffective in failing to call potential witnesses. The United States Fifth Circuit Court of Appeals has noted that "complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002). Therefore, to show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a petitioner "'must show not only that [the] testimony would have been

---

[38] State Rec., Vol. I of X, minute entry dated August 25, 2003, p. 2.

favorable, but also that the witness would have testified at trial.'"  Id. (quoting Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985)).  Because petitioner has not provided any evidence whatsoever, such as affidavits from the proposed witnesses, showing that the witnesses would have testified at trial and that their testimony would have been favorable to the defense, this claim necessarily fails.

Lastly, petitioner claims that counsel was ineffective in failing to object to the prosecution's "false and misleading" evidence concerning petitioner's travels and the source of his income.  However, there is no basis for concluding that the prosecution's evidence was "false," and it is at best debatable as to whether the evidence was "misleading" or instead merely subject to differing interpretations.  In any event, it has been noted:

> Generally speaking, a failure to object, standing alone, does not rise to the level of constitutionally deficient performance.  In cases where an accused complains that counsel was ineffective because he did not object to something ..., the courts grant significant deference, as such actions fall squarely within the ambit of trial strategy.

Rios-Delgado v. United States, 117 F.Supp.2d 581, 589 (W.D. Tex. 2000); see also Burnett v. Collins, 982 F.2d 922, 930 (5th Cir. 1993); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *9 (E.D. La. Dec. 11, 2008).  Moreover, petitioner has not shown that he was prejudiced by counsel's failure to object to the evidence in question.  Petitioner has not established that the evidence at issue would have been subject to exclusion or that there is a reasonable probability that the result of the proceeding would have been different if only such objections had been made.

In summary, petitioner has not demonstrated that the state courts' decisions rejecting his ineffective assistance of counsel claims were contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, in light of the AEDPA's deferential standard, this Court likewise rejects those claims.

Prosecutorial Misconduct

Petitioner claims that the prosecution engaged in misconduct, with permission of the trial judge, by allowing Shaw to remove evidence. As indicated above, Shaw was not in fact allowed to remove evidence so as to make it unavailable for trial. The prosecutor stated on the record that the documentary evidence in question was copied and those copies were turned over to counsel.[39] Petitioner's counsel did not dispute that assertion,[40] and petitioner has presented no evidence whatsoever to refute the assertion. Accordingly, there is simply no reason to believe that any relevant evidence seized from Shaw at the time of his arrest was unavailable for counsel's use at trial.

Petitioner claims that the prosecution also engaged in misconduct by introducing Shaw's false testimony regarding prior bad acts. For a petitioner to establish that his constitutional rights have been violated by the prosecution's introduction of allegedly false testimony, "it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements." Kutzner v. Cockrell, 303 F.3d 333, 337 (5th Cir. 2002). Rather, a petitioner "must show (1) the *actual falsity* of a witness's testimony, (2) that the testimony was material, and (3) that the

---

[39] State Rec., Vol. II of X, transcript of August 18, 2003, p. 50; see also State Rec., Vol. II of X, transcript of August 18, 2003, p. 96.

[40] State Rec., Vol. II of X, transcript of August 18, 2003, p. 50.

prosecution *knew* the witness's testimony was false." <u>Kutzner v. Johnson</u>, 242 F.3d 605, 609 (5th Cir. 2001) (emphasis added). In this case, petitioner has failed to show that Shaw's testimony was in fact false, much less that the prosecution knew it was false. Accordingly, petitioner has not met his burden of proof with respect to this claim.

Petitioner next claims that the prosecution engaged in misconduct by failing to disclose the fact that fingerprints had been found on the physical evidence and that petitioner's fingerprints were not among those found. That claim fails for the following reasons.

Based on <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny, it is beyond cavil that the prosecution may not withhold from the defense exculpatory or impeachment evidence. The United States Supreme Court has held:

> A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the <u>Brady</u> duty extends to impeachment evidence as well as exculpatory evidence, and <u>Brady</u> suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor. Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, although a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The reversal of a conviction is required upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

<u>Youngblood v. West Virginia</u>, 547 U.S. 867, 869-70 (2006) (per curiam) (internal citations and quotation marks omitted). Therefore, to prevail on a <u>Brady</u> claim, the petitioner "must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment." <u>DiLosa v. Cain</u>, 279 F.3d 259, 262-63 (5th Cir. 2002).

Even if the Court assumes that such a fingerprint report existed, there is no evidence that it was withheld from the defense.  As noted previously, the state provided "open file" discovery in the instant case, making all of its evidence and files available to the defense for inspection,[41] and petitioner has presented no evidence whatsoever in support of his contention that such a report was withheld.  Such an omission of any evidence on the initial prong of the <u>Brady</u> inquiry is, in and of itself, fatal to petitioner's claim.  <u>Williams v. Cain</u>, Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *5 (E.D. La. May 7, 2009); <u>see also</u> <u>United States v. Avellino</u>, 136 F.3d 249, 261 (2nd Cir. 1998); <u>Cruz v. Artuz</u>, 97-CV-2508, 2002 WL 1359386, at *14 (E.D.N.Y. June 24, 2002); <u>Harris v. United States</u>, 9 F.Supp.2d 246, 275 (S.D.N.Y. 1998), <u>aff'd</u>, 216 F.3d 1072 (2nd Cir. 2000).

Further, even if such a report existed and was in fact withheld, that still would not rise to the level of a <u>Brady</u> violation.  While evidence regarding the lack of petitioner's fingerprints might have been helpful to the defense, that is not the standard for required disclosure.  <u>Brady</u> is not violated simply because potentially *helpful* information is withheld.  See <u>Kyles v. Whitley</u>, 514 U.S. 419, 436-37 (1995); <u>Wyatt v. Dretke</u>, 165 Fed. App'x 335, 341 (5th Cir. 2006).  Rather, <u>Brady</u> and its progeny require only that the prosecution produce *exculpatory* or *impeachment* evidence.  This information had no impeachment value, in that no witness testified to the contrary.  Moreover, the negative fingerprint analysis would not show that petitioner never handled the evidence, but rather only that there were no fingerprints proving that he had done so.  That information is not exculpatory and does not put the whole case in such a different light as to undermine confidence in the verdict.

---

[41]  State Rec., Vol. I of X, State's Answer to Motions for Discovery.

See, e.g., United States v. Fisher, 43 Fed. App'x 507, 510 (3rd Cir. 2002); United States v. Hammer, 561 F.Supp. 386, 391 (D.C. Mass. 1983), aff'd, 729 F.2d 10 (1st Cir. 1984).

Lastly, petitioner claims that he was incarcerated in harsh conditions during trial. He complains that, during trial, he was awakened at 4:30 a.m., not given breakfast, and placed in a "freezing" holding cell. After each day of trial, he was taken back to a small holding cell where he remained until midnight. This treatment left him feeling "tired, fatigued and just plain run down."[42] Even if the Court assumes that the conditions of a prisoner's confinement during trial could be so egregious that it would unconstitutionally infringe on his ability to receive a fair trial, this is not such a case. First, the conditions alleged, while arguably harsh, were not debilitating. Second, in any event, petitioner presents no evidence whatsoever in support of this claim, and the record does not reflect that either petitioner or his counsel made any suggestion during trial that petitioner was being subjected to such conditions. Accordingly, petitioner has failed to prove his claim, and the claim therefore necessarily fails.

## Judicial Bias

Petitioner claims that the trial judge was biased as evidenced by the fact that he made demeaning statements at sentencing concerning petitioner's failure to admit his involvement in the crime of which he was convicted. Specifically, petitioner points to the following comment:

> [T]he Court takes note of the fact that both during the course of the trial and even through the pre-sentence investigation, Mr. Lines continues to disclaim any responsibility or any involvement in this activity. The Court finds this both unbelievable and also reprehensible from the standpoint that, until such time as an

---

[42] Rec. Doc. 1, p. 9.

individual accepts responsibility for his or her actions, there is very little chance of rehabilitation in that individual.[43]

Petitioner counters that "[t]he Court itself should be ashamed because they had convicted an innocent man, and then proceeded to sentence him to thirty years and fine him $250,000.00 for his non-involvement of a crime to which he had no knowledge."[44]  Petitioner explains:

> You do not feel remorse when being convicted for a crime in which you had no part except as being a pawn.  You do not feel remorse for being convicted of a crime for which you could not have stopped if you knew nothing about its being committed in the first place.  You do feel remorse, however, when the court allows a convicted felon to remove evidence from the evidence acquired in a crime to which he and that evidence are a major part, and can possibly prove his guilt.  You do not however, admit any guilt when you yourself were not a part of a crime you are being charged with, and you surely do not require rehabilitation for something you had not done in the first place.[45]

This Court understands that petitioner protests that he is innocent.  Nevertheless, at sentencing, he stood convicted by a jury of his peers.  The trial judge was merely observing that, despite that conviction, petitioner continued to accept no responsibility for the crime.  The accuracy of that observation is clear, as evidenced by petitioner's statements in this proceeding.  Moreover, the judge's observation was fair, appropriate, and in no way indicative of bias.  Accordingly, petitioner's claim clearly has no merit.

---

[43]  State Rec., Vol. VIII of X, transcript of October 31, 2003, p. 11.

[44]  Rec. Doc. 1, supporting memorandum, p. 19.

[45]  Rec. Doc. 1, supporting memorandum, p. 20.

<u>Sufficiency of the Evidence</u>

Petitioner next claims that there was insufficient evidence to support his conviction.

On direct appeal, the Louisiana First Circuit Court of Appeal rejected that claim, holding:

[T]he defendant contends the evidence was insufficient to support the conviction because it was based on unreliable and tainted testimony. He argues Shaw's testimony was unbelievable because he testified as a result of deal he had made with the State.

When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated by the United State[s] Supreme Court in **Jackson v. Virginia**, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). To affirm the conviction the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that the State proved all elements of the crime beyond a reasonable doubt. **State v. Johnson**, 2003-1228, p. 4 (La. 4/14/04), 870 So.2d 995, 998. Further, when the conviction is based on circumstantial evidence, the court also must be mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove, in order to convict," every reasonable hypothesis of innocence is excluded. **State v. Wright**, 98-0601, p. 2 (La. App. 1st Cir. 2/19/99), 730 So.2d 485, 486, <u>writs denied</u>, 99-0802 (La. 10/29/99), 748 So.2d 1157, 2000-0895 (La. 11/17/00), 773 So.2d 732 (quoting La. R.S. 15:438).

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **Wright**, 98-0601 at p. 3, 730 So.2d at 487.

The defendant in the instant case was charged with possession of cocaine in excess of 400 grams, a violation of La. R.S. 40:967 F(1)(c). To support a conviction for possession of cocaine, the State must present evidence establishing beyond a reasonable doubt that: (1) the defendant was in possession of the drug; (2) the defendant

knowingly and intentionally possessed it; and (3) the amount possessed was "four hundred grams or more of cocaine or of a mixture or substance containing a detectable amount of cocaine or of its analogues as provide in Schedule II(A)(4) of R.S. 40:964." La. R.S. 40:967 F(1)(c). Possession of narcotic drugs can be established by actual possession or by constructive possession. A person can be found to be in constructive possession of a controlled substance if the State can establish that he had dominion and control over the contraband, even in the absence of physical possession. **State v. Major**, 2003-3522, p. 7 (La. 12/1/04), 888 So.2d 798, 802.

A determination of whether there is sufficient "possession" of a drug to convict depends on the particular facts of each case. Although mere presence in an area where drugs are located or mere association with one possessing drugs does not constitute constructive possession, the Louisiana Supreme Court has set forth several factors to be considered in determining whether a defendant exercised sufficient control and dominion to establish constructive possession, including: (1) his knowledge that drugs were in the area; (2) his relationship with the person, if any, found to be in actual possession; (3) his access to the area where the drugs were found; (4) evidence of recent drug consumption; and (5) physical proximity to drugs. **Major**, 2003-3522 at pp. 7-8, 888 So.2d at 802.

Guilty knowledge is also an essential element of the crime of possession of cocaine. However, since knowledge is a state of mind, it need not be proven as a fact, but rather may be inferred from the circumstances. **Major**, 2003-3522 at pp. 8-9, 888 So.2d at 803.

After a thorough review of the record, we conclude the evidence presented herein, viewed in the light most favorable to the State, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of possession of cocaine in excess of 400 grams and the defendant's identity as a perpetrator of that offense. The State sufficiently established the defendant's dominion and control over the cocaine recovered from the Explorer. Shaw's testimony established the defendant's knowledge of the cocaine and his supplying it to Seawell. The defendant admitted his relationship to Seawell, the person found to be in actual possession of the cocaine. The reviewing court is not required to determine whether it believes the eyewitnesses or whether it believes that the evidence establishes guilt beyond a reasonable doubt. **Major**, 2003-3522 at pp. 6-7, 888 So.2d at 802. The verdict rendered against the defendant indicates the jury accepted the

testimony of the State's witnesses and rejected the testimony of the defendant. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. **State v. Johnson**, 99-0385, p. 9 (La. App. 1st Cir. 1/5/99), 745 So.2d 217, 223, <u>writs denied</u>, 2000-0829 (La. 11/13/00), 774 So.2d 971. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. **State v. Glynn**, 94-0332, p. 32 (La. App. 1st Cir. 4/7/95), 653 So.2d 1288, 1310, <u>writs denied</u>, 95-1153 (La. 10/6/95), 661 So.2d 464.

This assignment is without merit.[46]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Taylor v. Day</u>, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), <u>aff'd</u>, 213 F.3d 639 (5th Cir. 2000). For the following reasons, the Court finds that petitioner has made no such showing.

In this case, petitioner vociferously contends that he is not guilty and recounts in great detail the evidence and arguments he believes support his claim of innocence.[47] However, a federal *habeas* court does not reweigh the evidence to determine whether, in its opinion, the jury could have, or arguably should have, reached a different conclusion. Rather, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979):

---

[46] <u>State v. Lines</u>, No. 2004 KA 1074, at pp. 8-11; State Rec., Vol. X of X.

[47] Rec. Doc. 1, supporting memorandum, pp. 1-9

> In considering challenges to the sufficiency of evidence in habeas proceedings, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Jackson, 443 U.S. at 319). Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" Santellan, 271 F.3d at 193 (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).[48]

In this case, the jurors obviously found Shaw credible and petitioner incredible. Although petitioner disputes the jurors' conclusion in that regard, questions concerning credibility are generally beyond the scope of Jackson and *habeas* review. See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) ([A] challenge of the jury's credibility choice fails to satisfy the Jackson standard for habeas relief.").

---

[48] Moreover, Louisiana's circumstantial evidence standard requiring that the every reasonable hypothesis of innocence be excluded does not apply in a federal *habeas corpus* proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009); Davis v. Cain, Civ. Action No. 07-63892008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008).

Shaw's testimony and the other evidence presented, viewed in the light most favorable to the prosecution, were sufficient for any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, this Court must defer to the state court's decision on that claim.

### Excessive Sentence

With little explanation of his claim, petitioner asserts that his sentence is excessive. For the following reasons, this Court rejects that claim.

To the extent that petitioner is arguing that his sentence is excessive under state law, that claim is not cognizable in this federal proceeding. Federal *habeas corpus* relief is available only for violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law. Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998).

If, however, petitioner is arguing that his sentence is excessive under the Eighth Amendment of the United States Constitution, that argument has no merit. In Solem v. Helm, 463 U.S. 277, 284 (1983), the Supreme Court held that the Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." "This constitutional principle is tempered, however, by the corollary proposition that the determination of prison sentences is a legislative prerogative that is primarily within the province of legislatures, not courts." United States v. Gonzales, 121 F.3d 928, 942 (5th Cir. 1997) (citing Rummel v. Estelle, 445 U.S. 263, 274-76 (1980)). "[C]ourts must grant substantial deference to the broad authority that

legislatures necessarily possess in determining the types and limits of punishments for crimes."
Gonzales, 121 F.3d at 942 (quotation marks omitted). "[T]herefore, it is firmly established that successful challenges to the proportionality of punishments should be exceedingly rare." Id. (quotation marks omitted).

Interpreting Solem in light of intervening precedent, the United States Fifth Circuit Court of Appeals has set forth the framework to be used when analyzing a claim that a sentence is excessive:

> [W]e will initially make a threshold comparison of the gravity of [petitioner's] offenses against the severity of his sentence. Only if we infer that the sentence is grossly disproportionate to the offense will we then ... compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions.

McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992).

Further, the United States Fifth Circuit Court of Appeals has noted that Rummel v. Estelle, 445 U.S. 263 (1980), "establishes a benchmark for disproportionate punishment under the Eighth Amendment." Gonzales, 121 F.3d at 943. In Rummel, the United States Supreme Court had upheld a petitioner's sentence to life imprisonment for obtaining $120.75 under false pretenses. The sentence was imposed under a Texas recidivist statute and took into account petitioner's prior convictions for fraudulent use of a credit card and passing a forged check. The Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences and grossly disproportionate punishments is an inherently subjective judgment, defying bright lines and neutral principles of law. Nevertheless, we can say with certainty that the life sentence approved in Rummel falls on the constitutional side of the line,

thereby providing a litmus test for claims of disproportionate punishment in violation of the Eighth Amendment.

Gonzales, 121 F.3d at 943 (footnote omitted).

In the instant case, petitioner was transporting for distribution a massive amount of cocaine worth approximately $1,000,000. The gravity of such drug offenses is abundantly obvious, as numerous courts have noted. For example, in a case involving distribution of heroin, a similarly insidious and pernicious drug, the United States Fifth Circuit Court of Appeals held:

A life sentence for the crime of distribution of heroin serves substantial state interests in the same manner that state interests were served by a life sentence for recidivism in Rummel. The state could reasonably treat heroin distribution as a serious crime equivalent to crimes of violence. It could conclude:

. . . The drug seller, at every level of distribution, is at the root of the pervasive cycle of drug abuse. Measured thus by the harm it inflicts on the addict, and, through him, upon society as a whole, drug dealing in its present epidemic proportions is a grave offense of high rank.

State v. Terrebonne, [364 So.2d 1290, 1292 (La. 1978)], quoting Carmona v. Ward, [576 F.2d 405 (2nd Cir. 1978)].

Terrebonne v. Blackburn, 646 F.2d 997, 1002 (5th Cir. 1981). The Fifth Circuit also noted that drug distribution is particularly serious in light of the other crimes to which it often leads:

"More significant, of course, are the crimes which drug traffickers engender in others. ... The addict, to meet the seller's price, often turns to crime to 'feed' his habit. Narcotics addicts not only account for a sizable percentage of crimes against property; they commit a significant number of crimes of violence as well."

Terrebonne, 646 F.2d at 1002 (quoting Terrebonne, 364 So.2d at 1292).

In his concurring opinion in <u>Harmelin v. Michigan</u>, 501 U.S. 957 (1991), a case involving possession of cocaine, Justice Kennedy similarly noted the gravity of drug offenses:

> Possession, use, and distribution of illegal drugs represent one of the greatest problems affecting the health and welfare of our population. Petitioner's suggestion that his crime was nonviolent and victimless, echoed by the dissent, is false to the point of absurdity. To the contrary, petitioner's crime threatened to cause grave harm to society.
> Quite apart from the pernicious effects on the individual who consumes illegal drugs, such drugs relate to crime in at least three ways: (1) A drug user may commit crime because of drug-induced changes in physiological functions, cognitive ability, and mood; (2) A drug user may commit crime in order to obtain money to buy drugs; and (3) A violent crime may occur as part of the drug business or culture.

<u>Id</u>. at 1002 (citations and quotation marks omitted).

In light of the finding in <u>Rummel</u> that a *life* sentence was not excessive for the relatively minor offenses involved in that case, this Court has no hesitation in concluding that petitioner's sentence of thirty years imprisonment and a $250,000 fine under the more serious circumstances here is not grossly disproportionate. <u>See</u> <u>Chatman v. Miller</u>, Civ. Action No. 05-1481, 2005 WL 3588637, at *7-8 (E.D. La. Nov. 9, 2005) (upholding a thirty year sentence for distribution of cocaine within one thousand feet of a school or park); <u>Smith v. Leblanc</u>, Civil Action No. 03-2194, 2004 WL 551215, at *9 (E.D. La. Mar. 18, 2004) (upholding a twenty-two year sentence for distribution of $20 worth of crack cocaine). In that the sentence is not grossly disproportionate, this Court's "inquiry is finished." <u>Gonzales</u>, 121 F.3d at 942.

### RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petitioner's motion to reopen, Rec. Doc. 18, be **GRANTED**.

**IT IS FURTHER RECOMMENDED** that his petition for federal *habeas corpus* relief filed be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this third day of August, 2009.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**